Harry T. Nusbaum, J.
The plaintiff, a duly licensed finance company principally engaged in the business of purchasing installment contracts from automobile dealers, here sues to recover the unpaid balance of $796.60, plus attorney’s fees of $119.49, for a total of $916.09 allegedly due on a contract after the repossession and sale of the vehicle. The defendants, *139 Francisco and Maria Marcano by way of an answer deny all the material allegations of the complaint and have caused to be issued and served a third-party summons and complaint against Fiesta Motors Corp., the contract assignor and dealer from which the automobile was purchased.
From the testimony adduced at the trial, it would appear that on September 26,1967, the defendants signed a retail installment contract for the purchase of a 1961 Cadillac convertible for the sum of $1,395, plus sales tax and miscellaneous fees totaling $71.75 and credit charges of $299.48, for a total of $1,766.23. On this sum the defendants made a cash down payment of $219.75 and obligated themselves to pay the balance of $1,546.48 in 104 weekly installments of $14.87 each. The contract was duly assigned and guaranteed to the plaintiff corporation on October 3, 1967, which advanced the sum of $650 thereon, holding in reserve the sum of $764.48 because of the defendants’ poor credit rating.
The contract signed by the defendants was on a printed form, upon which the name of the plaintiff, Jefferson Credit Corporation was imprinted in several clauses. The contract is printed entirely in English and from this court’s observation of the defendant Francisco Marcano, who testified with the aid of a Spanish interpreter, it is doubtful whether any of the clauses were within his grasp or understanding.
At the time the sale was made, the defendants allege and the third-party defendant Fiesta Motors Corp. admits, that a 30-day guarantee on the motor vehicle was given to the defendants. One week later and on two subsequent occasions during the 30-day period, the defendants returned the motor vehicle to the third-party defendant for repairs. He complained of repeated road breakdowns and specifically requested that the transmission and emergency brake be repaired and that the convertible top be fixed. On each occasion he was assured that the repairs would be made and the car put in good running condition. These assurances continued until the .30-day guarantee period had expired, after which the purchaser was advised by the dealer, Fiesta Motors, that its responsibility under the guarantee was over.
Nevertheless the defendants Marcano continued to make the payments under the contract of sale until March 11, 1968, when the car was repossessed by the plaintiff. In a further effort to straighten the matter out, the defendant Marcano on March 15, 1968 paid the plaintiff a repossession charge of $25 and subsequently thereto made regular weekly payments of $15 each on March 26, April 2 and April 9. During this period he *140 attempted to work out an exchange for a better ear. These efforts came to nought.
Thereafter the defendant Marcano lodged complaints with the license department and the Attorney-General’s office, which extracted an agreement from Fiesta Motors Corp. to pay one half of the cost of repairs which was estimated to be approximately $300. However, the defendants Marcano refused the offer, maintaining that the car was defective and unfit for use on the highway from the day it was purchased. On April 16, 1968, the plaintiff Jefferson Credit Corporation notified the defendants ‘1 pursuant to Article 9, Section 504 of the Uniform Commercial Code, that the repossessed vehicle will be held in our possession until April 22, 1968, after which it will be sold.” On April 26, 1968, the plaintiff, Jefferson Credit Corporation sold the car at a private sale to the third-party defendant Fiesta Motors for the sum of $348. The Fiesta Motors Corp. repaired the car’s transmission and replaced the top at a cost of $402 and resold the car for $1,050.
At this point a review of the arithmetic and financial facts surrounding this transaction may prove interesting.
On September 26, 1967, the defendants purchased the car for the net sum of $1,694.48 ($1,395, plus finance charges of $299.48). Of this sum the defendants paid $219.75 to Fiesta Motors as a down payment and $401.88 to the plaintiff, Jefferson Credit in installment payments for a total of $621.63. Approximately six months later the plaintiff repossessed the car and sold it to the third-party defendant for $348. Thus the plaintiff has already received $401.88 plus $348 for a total of $749.88 to cover its outlay of $650.
The third-party defendant has received $650 from the plaintiff, $219.75 from the defendants Marcano and the additional net sum of $300 ($1,050 less $348 and $402) on the resale of the car, for a total of $1,169.75. The defendants third-party plaintiffs now have no car, have paid $621.63 for partial use of a defective motor vehicle for six months and are here being sued for the additional sum of $916.09 plus interest.
It is the opinion of this court that the contract was unconscionable from its inception, within the purview of section 2-302 of the Uniform Commercial Code and that the subsequent acts of the plaintiff and the third-party defendants were in violation of section 9-504 of the Uniform Commercial Code.
The application of the doctrine of caveat emptor presupposes some parity or equality between the bargaining parties (Jones v. Star Credit Corp., 59 Misc 2d 189; Star Credit Corp. v. Molina, 59 Misc 2d 290, 293). In the case- at bar there is no *141 semblance of such parity. The defendant, Francisco Marcano with whom the plaintiff’s assignor conducted all its business had at best a sketchy knowledge of the English language. It can be stated with a fair degree of certainty that he neither knew nor understood he had waived the implied warranty of merchantability and the implied warranty of fitness for a particular purpose, despite the fact that those waivers are printed in large black type in the contract. It is likewise impossible to assume he knew or understood that he agreed not to set up any claims, defenses, counterclaims, setoffs or cross complaints in any action brought by the assignee of the contract.
During the past several years the constant and growing increase in the production of consumer goods of all kinds and the resulting need to find markets for the sale of these products, coupled with increased employment and general public affluence, have created unprecedented credit expansion which places these products within the reach of all persons, regardless of their economic status.
The possession of automobiles, color TV sets, freezers, stereo record players and the like, have in and of themselves become the status symbols of success and the urgent need to protect the heedless seekers of these symbols from the few unscrupulous merchants who prey upon them has been acknowledged. In 1942, in the case of United States v. Bethlehem Steel Corp. (315 U. S. 289, 326) Justice Frankfurter asked the rhetorical question, “ Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has unconscionably taken advantage of the necessities of the other.”
The establishment of the many departments of consumer affairs and consumer protection bureaus as official agencies of our city, State and Federal Government and the enactment of truth-in-lending and truth-in-advertising legislation is proof, if there need be any, of the recognition of the need to protect consumers, even against their own improvidence.
The adoption and enactment of the Uniform Commercial Code by the New York State Legislature in 1962, to become effective on September 27, 1964, was but further evidence of the determination of our lawmakers to establish fair and equitable conduct as the rule of law in commercial business transactions. The continued need for even stronger legislation to protect the innocent and unwary consumer is carefully documented by Prof. Littlefield and by Philip J. Murphy, Esq. in volume 44 of *142 the New York University Law Eeview in articles beginning respectively at pages 272 and 298.
It is my opinion that the lack of equality between the bargaining parties, the contract clauses under which the defendants unwittingly and unknowingly waived both the warranty of merchantability and the warranty of fitness for the purpose for which the motor vehicle was purchased, and the defective condition of the motor vehicle, are sufficient to render the contract unenforceable under the provisions of section 2-302 of the Uniform Commercial Code as between Francisco and Maria Marcano and the Fiesta Motors Corp.
Having reached the conclusion that the contract would be unenforceable by Fiesta Motors Corp., the third-party defendant, the next question which presents itself is whether the plaintiff, the alleged innocent assignee of the contract is likewise barred from the enforcement of the contract with respect to the payments due thereunder.
There is grave doubt whether the plaintiff took the assignment in ‘ ‘ good faith ’ ’ as required by the provisions of section 9-206 of the Uniform Commercial Code, if the defendants are to be bound by their agreement not to assert any claims or defenses they might have against the seller in an action brought by the assignee. There is much in the evidence adduced at the trial to indicate that the assignee was chargeable with the knowledge of the assignor’s acts and was such an integral part of the transaction from its inception as to be now precluded from enforcing the contract.
However, the question of the plaintiff’s “ good faith ” in this matter need not now be weighed. For it is the opinion of this court that under the provisions of section 9-504 of the Uniform Commercial Code, the plaintiff is foreclosed from collection of the balance allegedly still due and unpaid under this installment sales contract.
Section 9-504 sets forth the manner in which repossessed collateral shall be disposed of. Under the provisions of subdivision (3), such disposition may be by public or private sale, ‘ ‘ but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.” In addition, “ reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor ”.
Subdivision (5) of section 9-504 reads as follows: “ A person who is liable to a secured party under a guaranty, indorsement, repurchase agreement or the like and who receives a transfer *143 of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party. Such a transfer of collateral is not a sale or disposition of the collateral under this Article. ’ ’ Thorough research has failed to reveal any cases, either reported or otherwise, which interpret the provisions of subdivision (5) of section 9-504 of the Uniform Commercial Code. The subdivision is new and has no former counterpart in our statutes.
Admittedly the only notice ever sent to the defendants by the plaintiff was a letter dated April 16, 1968, which advised the defendants that the repossessed vehicle would be held in their possession until April 22, 1968, after which it would be sold. The alleged sale of the motor vehicle for the sum of $348 to the contract assignor, Fiesta Motors Corp., on April 26, 1968, some six months after the Fiesta Motors Corp. had sold it to the defendants for the sum of $1,395 does not meet the test set forth in subdivision (3) of section 9-504 that it “must be commercially reasonable ”. (McKinney v. Donahue, 59 N. Y. S. 2d 726.) What the alleged sale really amounted to was the payment to the Jefferson Credit Corporation by the Fiesta Motors Corp. of the balance due on the $650 advanced by it plus interest for the use of the money for approximately six months.
In addition, it is doubtful whether the transaction which took place on April 26, 1968 was a sale within the purview of subdivision (5) of section 9-504, and whether after that transaction took place the plaintiff, Jefferson Credit Corporation, retained any further interest in the subject matter of this action.
The assignment of the contract was executed by the president of the Fiesta Motors Corp., who also became the guarantor thereof. For all intents and purposes, the alleged sale of the collateral to the Fiesta Motors Corp. was in fact a transfer of collateral within the meaning of subdivision (5) of section 9-504 of the Uniform Commercial Code, which vested in Fiesta Motors Corp. the rights of the secured party, and was not a sale or disposition of the collateral. As no sale took place, as far as these defendants were concerned, and they received no notice of the subsequent sale by Fiesta Motors Corp., the requirements of the statute have not been satisfied. (Manufacturers Hanover Trust Co. v. Goldstein, 25 A D 2d 405; Associates Discount Corp. v. Cary, 47 Misc 2d 369.)
I therefore find and determine that the defendants, Francisco and Maria Marcano, should have judgment dismissing the complaint, with costs.